[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 14, 2006
THOMAS K. KAHN
CLERK

_____

Nos. 03-12554, 05-11399

_____

D. C. Docket Nos. 02-00249-CR-BE-S
02-00249-CR-KOB-HGD

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

DEWEY M. HAMAKER,
LINDA M. HAMAKER,
MORGAN CITY CONSTRUCTION, INC.,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(July 14, 2006)**

Before HULL, WILSON and GOLDBERG[*], Circuit Judges.

HULL, Circuit Judge:

Appellants Dewey Hamaker, Linda Hamaker, and Morgan City Construction, Inc. ("MCC") appeal their convictions for bank fraud and related offenses. The government cross-appeals both Hamakers' 18-month sentences on the grounds that the district court miscalculated the applicable sentencing Guidelines range. After review and oral argument, we affirm Appellants' convictions, vacate Appellants' sentences and remand for resentencing.

## I. FACTS

Appellant MCC was an Alabama construction company co-owned and managed by Appellants Dewey Hamaker and Linda Hamaker. MCC's principal client was Community Bank, a federally insured financial institution headquartered in Blountsville, Alabama. Between 1995 and 2001, MCC provided construction services for Community Bank's branches in Alabama and Tennessee.

In addition to this work for Community Bank, MCC also worked on various personal projects for Kennon Patterson, Senior ("Patterson"), who was the CEO of Community Bank. The work MCC performed for Patterson personally began in 1998 and took place at Heritage Valley Farms, Patterson's 1,000-acre horse farm in

---

[*]Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

2

Blountsville. MCC's work included the construction of barns, stables, an enclosed horse arena, storage buildings, and a 17,000 square-foot personal residence for Patterson.

During the time that MCC performed construction work at Community Bank's branches and on Patterson's personal property, Patterson was the CEO and chairman of the board of Community Bank, as well as the CEO and chairman of the board of Community Bancshares ("Bancshares"), the holding company for Community Bank.

Larry Bishop was Community Bank's Vice President of Construction and Maintenance and served as an "in house" general contractor for the various Community Bank construction projects. On behalf of Community Bank, Bishop communicated with subcontactors such as MCC and approved the invoices they submitted to the Bank. At the same time, Bishop was acting as the general contractor on the Heritage Valley Farms construction projects MCC performed for Patterson.

As detailed below, the convictions of Appellants arise out of their fraudulent billing of Community Bank for hundreds of thousands of dollars worth of construction services MCC performed for Patterson personally at Heritage Valley Farms, rather than for Community Bank.

3

## A. MCC's Management

Understanding the substantial evidence against Appellants requires a brief review of MCC's organization and record-keeping. As co-owners of MCC, a small construction firm, Appellants Dewey Hamaker and Linda Hamaker headed the company's operations and financial management. Dewey Hamaker principally supervised MCC's construction activities, including assigning workers to projects and monitoring their activities. Linda Hamaker focused on MCC's administration and accounting; her responsibilities included recording payments and receipts, processing payroll, generating invoices, and managing MCC's office staff.

For payroll purposes, MCC recorded the number of hours worked by each construction employee and the location at which the employee performed the work. MCC recorded this and other accounting information in a computerized records system called Quickbooks. MCC's Quickbooks records include an account for each of MCC's construction projects, and thus MCC's records document the materials, labor, and other costs MCC incurred on each particular project. Similarly, MCC's invoices generally identified the project to which the billable amount was attributed.

## B. MCC's Charges to Community Bank and Patterson

Between January 1, 1998 and July 15, 2000, MCC billed Community Bank

and received from Community Bank a total of $3,122,977 for work done on six Community Bank construction projects. This amount represented 93% of MCC's revenue over the period. Of this more than $3 million MCC invoiced to Community Bank, MCC's invoices attributed $484,750 to MCC's work on the so-called Guntersville project, the construction of a new Community Bank branch in Guntersville, Alabama.

Despite the nearly half-a-million dollars in charges MCC invoiced to Community Bank for the Guntersville project, MCC's records show that MCC incurred only $30,026.25 in labor costs at the Guntersville project during the same time period. As Dewey Hamaker testified at trial, MCC billed on a "cost plus" basis, and thus direct labor costs should have provided an accurate benchmark for MCC's invoicing.[1] By this measure, however, MCC invoiced Community Bank for more than 1600% of the labor costs MCC actually incurred at the Guntersville site. Although MCC's extremely high mark-up was most notable in the Guntersville account, MCC also billed Community Bank for between 325% to 845% of the labor costs MCC incurred at five other Community Bank construction projects between 1998 and 2000.

---

[1]Dewey Hamaker testified that MCC billed Community Bank for the labor costs MCC incurred plus a "bit of profit." He clarified that a 50% markup over labor costs was probably acceptable, and that a 100% markup was "more than fair."

5

In addition, MCC's records show that MCC incurred no labor costs at all on the Guntersville project between February 9, 2000 and June 20, 2000. Despite this, between those dates MCC invoiced Community Bank for, and received payment from Community Bank of, $178,500 for work purportedly done at Guntersville.

In stark contrast to MCC's charges to Community Bank, over the two-and-a-half years from January 1, 1998, to July 15, 2000, MCC received only $10,000 from Patterson for work MCC performed at Heritage Valley Farms.[2] MCC received this small amount despite the fact that, according to MCC's Quickbook records for that period, MCC employees worked over 61,000 hours at Heritage Valley Farms, incurring a total labor cost of $691,359.58. Thus, during the same time frame in which MCC billed Community Bank over 1600% of the labor costs at the Guntersville project, MCC received from Patterson less than 1.5% of the labor costs at his Heritage Valley Farms.

At the end of every year, Alabama construction firms must submit to the State of Alabama a response to a contractor's questionnaire listing ongoing major construction projects. Linda Hamaker prepared MCC's contractor's questionnaire and submitted it to the state on MCC's behalf on December 31, 1999. MCC's

---

[2]Prior to July 15, 2000, MCC sent Patterson two invoices for the Heritage Valley Farms work: a December 28, 1998 invoice for $37,500, and an April 21, 1999 invoice for $10,000. Patterson apparently paid only the second invoice.

1999 completed questionnaire listed four Community Bank projects as its only major jobs in progress, including Guntersville. MCC did not include any listing for Heritage Valley Farms or any other work for Patterson.

## C. Complaints by the Community Bank Board

In the spring of 2000, members of Community Bank's board of directors – Michael Alred, Wayne Washam, George Barnett, and Michael Bean (who was also Community Bank's Chief Financial Officer) – became concerned that despite the Bank's significant outlays for the Guntersville project, very little progress appeared to have been made at the Guntersville site. These board members raised their concerns formally at Community Bank's board meeting on June 20, 2000. They noted that despite all the money spent on the Guntersville project, absolutely nothing had been built above ground. Patterson responded by assuring the rest of the board that the expenses were justified, and he requested that the board conduct a full accounting of the project's progress.

After the board members looked into the Guntersville project further, they expressed further concern at a Bancshares board meeting on July 15, 2000, and at a second Community Bank board meeting on July 18, 2000. Appellant Dewey Hamaker attended both meetings. At the meetings, Dewey Hamaker assured the board members that MCC was not billing Community Bank for any work done on

7

Patterson's home at Heritage Valley Farms, and he asserted that MCC "did not charge expenses to Patterson's house except about every six months."

Two hours after the July 18, 2000 board meeting, Patterson called a meeting of the Community Bank board's Executive Committee, a subcommittee of the full board. At that meeting, Patterson recommended the dismissal of board members Michael Alred and Michael Bean. On September 28, 2000, Community Bank removed Alred, Bean, and Barnett from its board of directors. On November 10, 2000, Community Bank terminated the employment of Bean and Alred.

Shortly after the allegations of impropriety in July 2000, MCC markedly changed its billing practices for the work at Heritage Valley Farms. Before July 15, 2000, MCC had invoiced Patterson only twice and had received from him only $10,000. In the following five months, however, MCC sent Patterson twenty-nine invoices totaling over $460,000.

**D.    Investigation and Legal Action**

While the Bancshares board was meeting on July 15, 2000, the Marshall County Sheriff's Department searched MCC's office, seizing its computers, time sheets and other records. These records revealed the cost and billing patterns described above. In addition, MCC's records showed that on hundreds of occasions, charges that MCC had billed to Community Bank were described in

MCC's records with notations such as "Farm" or "HVF," revealing that the work had actually been performed at Heritage Valley Farms.[3]  In her testimony at trial, Linda Hamaker acknowledged transferring costs incurred at Heritage Valley Farms to Community Bank accounts.[4]

In late 2000, several Bancshares shareholders filed a derivative action alleging that Patterson, Bishop, the Hamakers, and MCC fraudulently used bank funds for non-bank purposes, principally the construction at Heritage Valley Farms.  In response, Community Bank and Bancshares formed a "Special Litigation Committee" and hired attorney William Lafferty to investigate the allegations.

On May 11, 2001, Lafferty interviewed Dewey and Linda Hamaker together.  Dewey Hamaker told Lafferty that MCC had never billed Community Bank for work done at Heritage Valley Farms.  Dewey Hamaker acknowledged to Lafferty

---

[3]One of MCC's financial reports (dated November 9, 1998) unquestionably showed that MCC was billing Community Bank for work done for Patterson.  On that report, the names of Community Bank construction projects were written by hand next to numerous entries listing labor costs and expenses incurred at Heritage Valley Farms.  MCC administrative employee Tina Rogers testified that she made these notes at Linda Hamaker's direction.

As of July 15, 2000, the identical cost and expense entries appear in MCC's official records, but instead of being attributed to Heritage Valley Farms, they are attributed to the Community Bank projects named in the handwritten notes.

[4]In her testimony, Linda Hamaker attempted to explain these entries by claiming that she had transferred the costs because she "just wanted to see what it looked like in the computer." She denied ever invoicing Community Bank for these charges, although she acknowledged that she never corrected the entries.

9

that MCC generally billed on a "cost plus" basis, but asserted to Lafferty that MCC had planned to refrain from billing Patterson for the work at Heritage Valley Farms until the completion of the project. Linda Hamaker made no statements to Lafferty either confirming or contradicting her husband's characterization of MCC's billing practices.

In October, 2001, FBI agents executed a search warrant at the Hamakers' residence. As the FBI agents entered the Hamakers' house, Dewey Hamaker complained, "why am I the only one being punished and losing property in this thing? I wasn't the only one involved in this scheme."

## II. PROCEDURAL HISTORY

On August 30, 2002, a federal grand jury in the Northern District of Alabama returned a three-count superseding indictment against Appellants Dewey Hamaker, Linda Hamaker, and MCC.[5] Count One of the indictment charged the Appellants with conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 2, 371, 1005 and 1344. Count Two charged Appellants directly with bank fraud, in violation of 18 U.S.C. §§ 2 and 1344. Count Three sought forfeiture of at least $1,685,000 in alleged proceeds of the bank fraud pursuant to 18 U.S.C. § 982(a)(2)(A).

---

[5]According to the government at oral argument, Patterson and Bishop were tried and convicted separately.

A jury trial began on October 21, 2002. After three days of deliberation, on October 30, 2002, the jury found Appellants guilty of Counts One and Two. On October 31, 2002, the jury returned a forfeiture verdict of $178,500 on Count Three.

## A. Post-Trial Motions

On November 8, 2002, Appellants filed, pursuant to Federal Rules of Criminal Procedure 29 and 33, a joint motion seeking judgments of acquittal or, alternatively, a new trial. Among other arguments, Appellants contended that the evidence presented at trial was insufficient for any reasonable jury to have found them guilty beyond a reasonable doubt. See Fed. R. Crim. P. 29. On November 20, 2002, Appellants filed an amended version of the same motion.

On February 4, 2003, the district court denied both the November 8, 2002 motion and the November 20, 2002 amended motion. The district court found "that the government presented more than adequate evidence on all elements of the offenses." However, the district court also felt "compelled to comment about the numerous allegations against these defendants and the evidence submitted."

According to the district court, the government "repeatedly focused on allegations of a grand conspiracy" between the Hamakers, Patterson and Bishop. In the district court's view, however, the government failed to prove this grand

11

conspiracy. Instead, "[w]ith the exception of invoices for the Guntersville [project], the Government failed to establish that the invoices submitted were not, in fact, for work performed on Bank projects."

Nevertheless, the district court "conclude[d] that the government presented more than ample evidence of the defendants' involvement in a scheme to defraud Community Bank, but only regarding the Guntersville Branch work." The district court interpreted the jury's forfeiture verdict as confirmation that the government's case was proved beyond a reasonable doubt only with respect to the Guntersville project. The district court noted that while the government sought a forfeiture of over $1.6 million, the jury ruled instead that the Appellants should forfeit only $178,500, "the precise amount of the invoices the [Appellants] submitted to Community Bank for the Guntersville project after all work ceased on that project."

## B.    Sentencing

On March 27, 2003, the U.S. Probation Office submitted Presentence Investigation Reports ("PSIs") for each Appellant. The PSIs recommended a base offense level of 6, see U.S.S.G. § 2F1.1(a),[6] and a two-level role enhancement for

___

[6]Effective November 1, 2001, the provisions of § 2F1.1 were deleted and incorporated into § 2B1.1. However, the PSIs applied the 1998 Guidelines, and no party raises an issue on appeal as to what version of the Guidelines to apply. Accordingly, all Guidelines citations in this opinion refer to the 1998 Guidelines.

more than minimal planning, see U.S.S.G. § 2F1.1(b)(2)(A).  The PSIs also estimated that Community Bank had suffered approximately $2,000,000 in losses as a result of Appellants' criminal conduct.  Accordingly, the PSIs recommended that the Appellants be assigned a twelve-level loss enhancement, see U.S.S.G. §2F1.1(b)(1)(M), and a four-level enhancement for gross receipts of over $1,000,000 from an offense affecting a financial institution, see U.S.S.G. §2F1.1(b)(7)(B).  A total adjusted offense level of 24 resulted in a Guidelines range of 51 to 63 months.

Before sentencing, however, the district court directed the Probation Office to amend the PSIs to reflect a loss figure of $178,500, the amount of the jury's forfeiture verdict.  The district court explained that "based on the evidence at trial, the government failed to prove a loss amount" of over $2,000,000.  A $178,500 loss calculation would warrant only a seven-level loss enhancement, see U.S.S.G. § 2F1.1(b)(1)(H), and no enhancement for gross receipts of over $1,000,000 from a financial institution.  Thus, the amended PSIs recommended a total offense level of 15, with a resultant Guidelines range of 18 to 24 months' imprisonment.

The district court held a sentencing hearing on May 6, 2003.  The government presented evidence in support of its claimed loss amount of over $2,000,000, but the district court was not persuaded.  The district court settled

upon a loss amount of $178,500, explaining that "because the only allegations that the government proved at trial beyond a reasonable doubt involved the Guntersville project, . . . the court must determine the loss incurred by the bank on that project, not the total loss . . . ."

After adopting the loss amount from the amended PSIs, the district court sentenced Dewey Hamaker and Linda Hamaker to 18 months' imprisonment, and ordered them to pay restitution in the amount of $178,500.  The district court sentenced MCC to a one-year term of probation.

## C.    Appeal and Remand

Appellants timely appealed their convictions and sentences on May 12, 2003.  While the appeal was pending, the government revealed to Appellants a number of documents related to the case that it inadvertently had failed to produce prior to trial.  On December 1, 2003, Appellants filed a motion in this Court requesting that appellate proceedings be stayed, and the case remanded to district court, to allow Appellants to file a renewed motion for acquittal on the grounds that their defense was prejudiced by the withholding of this evidence.

On December 24, 2003, this Court denied without prejudice Appellants' motion for remand.  Rather than remand, we granted Appellants' motion to stay the appeal, and instructed Appellants to file in district court, within fourteen days, a

motion to reconsider the denial of Appellants' motion for acquittal. On January 7, 2004, Appellants jointly filed, in district court, a "Renewed Motion for Acquittal" based on the withheld material evidence.

On February 26, 2004, the district court referred Appellants' motion to a magistrate judge for full briefing and review. On May 11, 2004, the magistrate judge issued a lengthy Report and Recommendation ("R & R"), recommending that Appellants' motion be denied. The magistrate judge concluded that the documents in issue were not withheld by the government in bad faith, that many of the withheld documents were not favorable to Appellants, and that Appellants had failed to show any reasonable probability that the outcome of their trial was affected by the failure to disclose the remaining documents.

After receiving the R & R, the district court entered an order on October 18, 2004, advising this Court that, although it did not intend to grant "the precise relief" sought by Appellants, the district court believed that a more "thorough analysis of the issues" raised by the Appellants was warranted. Accordingly, on November 16, 2004, we remanded the case to the district court for a complete resolution of Appellants' renewed motion for acquittal.

On January 19, 2005, the district court entered an order overruling Appellants' objections to the R & R, adopting the R & R, and denying Appellants'

renewed motion for acquittal. The district court noted, however, that it only "adopt[ed] the factual and procedural recitations, the legal analysis, and the [magistrate's] conclusion that the suppressed documents were not material to the [Appellants'] convictions related to the Guntersville project." (Emphasis in original). The district court reiterated its earlier finding that "the Government failed to present evidence sufficient to establish beyond a reasonable doubt that [Appellants] conspired to or defrauded the Bank on any other projects or any other bills [other than Guntersville]."

The district court emphasized that its adoption of the R & R was predicated on the fact that the withheld documents bore little relationship to the evidence concerning the Guntersville project. The district court explained that if it "erred in finding inadequate evidence to support a conviction or require consideration of the broader conspiracy allegations in sentencing, then a more thorough analysis should be done concerning the suppressed documents as a whole and the cumulative effect that information could have had on those broader issues at trial."

The Appellants timely appealed the denial of their renewed motion for acquittal. On September 22, 2005, we vacated nunc pro tunc our November 16, 2004 order remanding Appellants' original appeal to the district court, and granted Appellants' motion to consolidate their appeal with respect to the renewed motion

16

to acquittal with their original appeal of the convictions and sentences.

## III.  APPEAL OF CONVICTIONS

Appellants challenge their convictions on four grounds: (1) that the district court erred by refusing to instruct the jury regarding the law of apparent authority; (2) that the government failed to disclose certain documents to the defense prior to trial; (3) that the district court erred by allowing an FBI financial analyst to testify as a lay witness; and (4) that insufficient evidence supported the jury's verdict. These issues are addressed in turn.

### A.    Jury Instruction

Appellants claim that the district court erred by refusing to instruct the jury on the law of agency and apparent authority.[7] At trial, the central defense theory was that Appellants billed Community Bank only as directed by Bishop, Community Bank's Vice President.  According to Appellants, Bishop, who acted as general contractor for MCC's projects both for Community Bank and for Patterson, instructed MCC as to how to bill Community Bank for the projects. Appellants argued that they reasonably assumed that Bishop, as Community Bank's agent, had the authority to speak for the Bank with respect to billing. Appellants contend that they did not defraud the Bank because even if they

---

[7]We review the denial of a request for a particular jury instruction for abuse of discretion. United States v. Yeager, 331 F.3d 1216, 1222 (11th Cir. 2003).

17

wrongfully billed Community Bank for Patterson's personal projects, they merely billed the bank in accordance with the instructions of its agent, Bishop.

To support this defense theory, defense counsel requested that the district court instruct the jury on the law of apparent authority. The requested charge would have told the jury that when a party deals with the authorized agent of a principal, the party is entitled to rely on the assumption that the agent speaks on the principal's behalf and that the principal consented to the acts and representations made by the agent.[8]

The district court chose to issue a "good faith" instruction rather than an "apparent authority" instruction. The district court explained that although the requested apparent authority charge correctly stated the law of agency, the district court did not believe the proposed charge was a correct statement of law applicable to a criminal fraud case. Believing that the proposed charge would merely confuse the jury, the district court instead instructed the jury with respect to "intent to defraud" and the "good faith" defense. Specifically, the district court instructed

_____

[8]Specifically, defense counsel requested the following charge:
An agent is one who is authorized to act on behalf or in the place of another. That authority may be express or may be implied by circumstance. Third parties dealing with an agent are entitled to rely on statements and representation to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to acts and representations done on his behalf by the person purporting to act for him.

18

that "[a] defendant acts with intent to defraud if the defendant acted knowingly and with the specific intent to deceive . . . ." The district court further instructed that "[g]ood faith is a complete defense to the charges in the indictment because good faith on the part of the defendant is inconsistent with intent to defraud or willfulness that is an essential element of the charges."

The district court's decision not to instruct on apparent authority, but rather to instruct regarding a good faith defense to allegations of fraud, was entirely correct. Although the requested charge was an accurate statement of agency law as applied to civil contract disputes, the instruction would have been misleading to the jury in this criminal case charging bank fraud.

The agent of a financial institution is never empowered to authorize a fraud on the institution. See United States v. Gregory, 730 F.2d 692, 701 (11th Cir. 1984) (stating that a bank's board of directors "cannot validate a fraud on the bank"); see also United States v. Aubin, 87 F.3d 141, 148 (5th Cir. 1996) (same); United States v. Salinas, 654 F.2d 319, 328 (5th Cir. Unit A Aug. 1981)[9] (same), overruled in part on other grounds, United States v. Adamson, 700 F.2d 953 (5th Cir. Unit B 1983); 18 U.S.C. § 656 (criminalizing embezzlement or misapplication

_____

[9]The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

of bank funds by a bank's employees or agents).  Charging the jury that a party is entitled to rely on an agent's statements would have wrongly implied that so long as Bishop instructed Appellants in the manner that they billed Community Bank, Appellants were necessarily innocent of conspiracy and fraud and their own knowledge and intent did not matter.   On the contrary, the fact that a defalcating agent of the bank instructed Appellants does not prove that Appellants are innocent of defrauding the bank.

Bishop's role in guiding Appellants' billing practices was relevant only in the sense that he provided Appellants with a possible good faith defense.  If Bishop's actions led Appellants to the honest belief that they were not deceiving Community Bank, they lacked the required mens rea to be found guilty of fraud. See United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). Bishop's status as an agent of the bank was not in question; the question put to the jury was whether Bishop's conduct led Appellants to the good faith belief that they were billing appropriately, or whether Appellants knew that they were deceiving the Bank.  Accordingly, the district court's good faith instruction adequately and correctly charged the jury regarding the key legal question with respect to Appellants' theory of defense.  As its verdict demonstrates, the jury simply rejected that theory.

20

**B. Failure to Disclose Evidence**

**1) Withheld Documents**

On November 6, 2003 – roughly a year after Appellants were convicted – the government discovered a number of documents from the investigation of Appellants that it inadvertently had failed to produce prior to trial. These documents were memoranda and other material related to the government's pre-trial interviews of certain witnesses. Upon discovering the material, the government notified Appellants' counsel and provided Appellants with copies of all of the previously withheld material.

The district court denied Appellants' renewed post-trial motion based on the withheld documents. Appellants now reassert the arguments from that motion, contending that the material was withheld in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963) (establishing a pretrial government duty to disclose to defendant all evidence material to guilt or punishment) and/or in violation of the Jencks Act, 18 U.S.C. § 3500 (requiring that once a witness has testified on direct examination, the government must provide defendant with any related statements by that witness).

In denying Appellants' post-trial motion, the district court adopted in full the lengthy R & R recommending that the district court reject Appellants' Brady and

21

Jencks Act arguments. The R & R examined each of the withheld documents in great detail, concluding that: (1) most of the material did not qualify as either Brady or Jencks Act material; and (2) to the extent that the withheld documents did qualify as either Brady or Jencks Act material, the non-disclosure of the documents did not prejudice Appellants and therefore did not warrant any relief. See United States v. Bueno-Sierra, 99 F.3d 375, 379-80 (11th Cir. 1996); United States v. Conroy, 589 F.2d 1258, 1273 (5th Cir. 1979). The discussion of Appellants' Brady and Jencks Act arguments in the R & R, adopted by the district court, is comprehensive and well reasoned. We agree that most of the material was not Brady or Jencks Act material at all, and that non-disclosure of this material did not prejudice Appellants in any way.

In addition, although the district court pointed out that none of the withheld documents related to the Guntersville project and seemed to decide the Brady and Jencks Act claims primarily on that basis, we do not so limit our review and ruling. We conclude that Appellants have failed to show prejudice from the withheld documents in connection with any and all aspects of the charges in Counts One, Two and Three, including but not limited to the Guntersville allegations. Accordingly, we conclude that the district court properly denied Appellants' post-

22

trial motion.[10]

**2)      Informant Status**

Appellants also raise one complaint of failure to disclose evidence that was not discussed in the R & R adopted by the district court. Appellants contend that the district court abused its discretion by allowing Tony Kitchens to testify as a government witness despite the government's failure to disclose Kitchens's status as a confidential informant in an unrelated criminal investigation in another state. This argument is wholly without merit.

On the day before Kitchens was scheduled to testify, the government filed an ex parte motion disclosing to the district court that Kitchens was a confidential informant in an investigation outside of Alabama. The government's motion requested a ruling that disclosure of Kitchens's confidential informant status was not required by Fed. R. Crim. P. 16, Brady, or Giglio v. United States, 405 U.S. 150 (1972). The government asserted that because Kitchens neither received nor was offered any benefit from testifying in Appellants' trial, his status as an informant in an unrelated matter was not exculpatory impeachment evidence. The government also asserted that disclosure of Kitchens's role to Appellants would

---

[10]Because Appellants' post-trial motion fails on the merits, we need not consider the proper relief had their motion succeeded. As the government points out, however, a new trial, not an acquittal, would ordinarily be the proper remedy for violations of Brady or the Jencks Act.

23

effectively disclose the information to the public, thereby endangering Kitchens' safety. The government noted that Kitchens was acting as an informant in a major drug trafficking investigation and that Kitchens had been threatened by people believed to be involved in that drug trafficking activity.

The district court entered an ex parte order granting the government's motion, finding that Kitchens's status as an informant was not information that the government was required to disclose to the defense under Rule 16, Brady, or Giglio, and also finding that disclosure would endanger Kitchens's safety. As such, Kitchens testified without revealing, or being questioned about, his status as an informant. However, due to an accidental disclosure by the district court clerk during trial, Appellants learned of Kitchens's role in the unrelated criminal investigation after he had testified in Appellants' trial but before the jury deliberated.

Appellants immediately complained that Kitchens's testimony was tainted by his ongoing role as a government informant in the unrelated criminal investigation, and they moved to strike his testimony. The district court denied the motion, but agreed to issue a jury instruction related to Kitchens's testimony. In that instruction, the district court informed the jury that Kitchens was a government informant in a separate matter and directed the jury to examine his testimony with

24

"greater care and caution than the testimony of ordinary witnesses."

On appeal, Appellants argue that the government's failure to disclose Kitchens' informant status to them prior to Kitchens' testimony warrants the grant of a new trial. Implicitly, Appellants argue that the district court abused its discretion by ruling that the government was not required to disclose Kitchens's informant status prior to his testifying.[11] We need not reach the merits of the district court's ruling because in any event Appellants have failed to establish any prejudice arising from that ruling and Appellants' resulting inability to cross-examine Kitchens regarding his status as a government informant in an unrelated matter.

First, Kitchens's status as a government informant in a drug prosecution taking place outside of Alabama and completely unrelated to this case was not exculpatory evidence in Appellants' case and was, at most, marginal impeachment evidence. At the time of Appellants' trial, Kitchens had no pending criminal charges, was not on parole or probation, and was not at risk of being prosecuted in

---

[11]Appellants do not appear to argue that the district court's ex parte ruling on the government's motion was erroneous because it was ex parte, i.e. purely because Appellants were excluded from arguing against the motion in camera. Appellants argue only that the substance of the ruling itself was an abuse of discretion. Even assuming they complain of the ex parte nature of the ruling, we note that Rule 16(d)(1) expressly permits this ex parte procedure. See Fed. R. Crim. P. 16(d)(1) (stating that a district court "may permit a party to show good cause [for not producing otherwise discoverable evidence] by a written statement that the court will inspect ex parte").

25

relation to this case. Thus, as pointed out in the government's ex parte motion, no pending matter existed in which the government could provide favorable treatment to Kitchens, and Kitchens was not promised or offered any kind of special consideration in exchange for his testimony. In addition, Kitchens had a past criminal record that the government did disclose to Appellants and with which Appellants' counsel impeached Kitchens at trial. Thus, any possible additional impeachment to be gained from questioning Kitchens on his status as a government informant in an unrelated matter in another state was weak at best.

Second, Appellants discovered Kitchens's informant status during trial and convinced the district court to offer a cautionary instruction. Thus, despite granting the government's pre-trial motion not to disclose Kitchens's status, the district court itself eventually highlighted Kitchens's role as a government informant, and the court instructed the jury to examine his testimony with greater caution. Given that Kitchens stood to gain nothing from testifying for the government in Appellants' case, the district court's decision to instruct the jury to approach his testimony with care was exceedingly cautious. Regardless, the fact that the court effectively told the jury to be wary of Kitchens's credibility accomplished the exact impeachment goal Appellants would have sought had they been able to cross-examine Kitchens about his informant status.

Third, Kitchens was a minor witness in the case. Kitchens testified primarily in support of the allegation that Appellants had purchased a motorcycle for personal use, and then billed Community Bank for the cost of the motorcycle as if it were an expense on a Community Bank construction project. Kitchens did not testify regarding Heritage Valley Farms, the Guntersville project, or MCC's overall billing practices, clearly the central focuses of the charges against Appellants.

All three of these reasons readily distinguish this case from those cited by Appellants, in particular United States v. Crumley, 565 F.2d 945 (5th Cir. 1978), the only controlling precedent cited by Appellants that is even arguably relevant. In Crumley, the defendant Leo Crumley was charged with receiving and storing a stolen motor vehicle. Id. at 946. One of the government's most inculpatory witnesses, G.J. Haynes, testified to Crumley's efforts to conceal and dispose of the stolen vehicle at Haynes's salvage lot. Id. at 948. On appeal, we vacated Crumley's conviction and ordered a new trial because the district court had prevented Crumley's counsel from impeaching Haynes's testimony on the basis that he was motivated to help the government because he stood to benefit from his testimony. Id. at 949. Specifically, the district court halted the cross-examination of Haynes about whether he feared being prosecuted because the officials investigating Crumley's motor vehicle theft had also found a stolen Cadillac at

27

Haynes's salvage lot.  Id.

The distinctions between Crumley and our case are material.  First, while Kitchens had nothing to gain from testifying against Appellants, the stolen Cadillac found on Haynes's property could have been the basis for charges against Haynes. Therefore, Haynes had a clear, self-interested motivation for testifying against Crumley, a motivation arising out of the very circumstances of the investigation of Crumley.  In comparison, Kitchens's involvement in a totally unrelated criminal investigation bore no relationship to Appellants' charges whatsoever, and Kitchens faced no risk of criminal liability related to his testimony in Appellants' case.

Second, when Crumley's counsel attempted to question Haynes about the stolen Cadillac, the district court not only sustained the government's objection to that line of questioning, the court actually instructed the jury to "disregard the inference" that the stolen Cadillac and the related threat of prosecution had motivated Haynes to testify on behalf of the government.  Id.  Our case presents the exact opposite: here, the district court cautioned the jury to consider Kitchens's testimony carefully.  This instruction, in which the court essentially impeached Kitchens's testimony on behalf of the Appellants, minimized any possible harm caused by Appellants' inability to cross-examine Kitchens.

Third, unlike Kitchens – a minor witness against Appellants – Haynes, the

28

witness in Crumley, was integral to the prosecution. See id. at 950. According to the Crumley Court, "Haynes' testimony was an important factor in the government's case and we cannot find beyond a reasonable doubt that if the jury had not believed Haynes it would not have acquitted Crumley." Id. Indeed, the subject of cross-examination that Crumley's counsel was forbidden to pursue – the fact that a stolen vehicle was also found at Haynes's lot – was potentially pivotal to Crumley's defense, because it might imply that Haynes, not Crumley, was the one involved in buying and selling stolen vehicles.

For these reasons, the non-disclosure of Kitchens's informant status prior to trial clearly does not warrant a re-trial.

## C. Testimony By FBI Analyst

FBI Financial Analyst Norman "Pete" Odom ("Odom"), the government's primary witness at trial, testified at length concerning MCC's financial and business records. Although Odom is a trained financial analyst with twenty-three years of experience, the district court permitted Odom to testify as a lay witness. Appellants contend that Odom should have been classified as an expert witness, and that Appellants were prejudiced because prior to trial, the government did not provide Appellants with a summary of Odom's expert testimony.[12]

---

[12]"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." United States v.

The government timely disclosed to Appellants that Odom would be a government witness. Prior to trial, the government also provided to Appellants all of the evidentiary documents that would be the basis of Odom's testimony, which in any case were almost exclusively documents that Odom had acquired from Appellants in the first place. However, the government did not declare Odom as an expert witness, and did not provide Appellants with a pre-trial summary of his expected testimony. Moreover, until the first day of trial, the government did not produce several summary charts the government intended to introduce during Odom's testimony.

Because the government produced Odom's summary charts only on the morning of the first day of trial, the district court excluded those charts from evidence. The district court asked rhetorically, "[h]ow can there be a fair trial for the defendant if the defense attorney is not given a key exhibit prior to the morning of trial?" Even so, over Appellants' objection, the district court allowed Odom to testify as a lay witness. Appellants contend that the district court abused its discretion because Odom effectively testified as an expert and should not have

---

Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc); see also Agro Air Assocs., Inc. v. Houston Cas. Co., 128 F.3d 1452, 1455 (11th Cir. 1997) (district court's admission of lay opinion evidence is reviewed for abuse of discretion).

been allowed to do so without the required disclosures.[13]

According to the Federal Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." Fed. R. Evid. 702. Where the government plans to present expert testimony in a criminal trial, the government is required to submit to a defendant a "written summary" of the expected testimony. See Fed. R. Crim. P. 16(a)(1)(G).[14]

The central purpose of Odom's testimony was to prove the fact that MCC billed Community Bank for work MCC performed for Patterson. However, Odom did not testify to this fact based on his financial expertise, nor did he express any

---

[13]We reject Appellants' contention that by excluding these charts, the district court effectively ruled that Odom could not testify as an expert. The district court excluded the charts solely due to their late production, and took no position on whether Odom was required to testify as an expert until ruling that Odom could testify as a lay witness.

[14]Rule 16, Discovery and Inspection, states in relevant part:
(a) Government's Disclosure.
(1) Information Subject to Disclosure.
(G) Expert Witnesses. At the defendant's request, the government shall disclose to the defendant a written summary of testimony the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony the government intends to use under Rules 702, 703, or 705 as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.
Fed. R. Crim. P. 16.

expert opinion in his testimony. Rather, Odom simply reviewed and summarized over seven thousand financial documents, primarily MCC's Quickbooks records, time sheets, invoices, and check stubs. In his testimony, Odom factually described MCC's records and then matched a small subset of the voluminous payroll, accounting, and invoice records.

For example, Odom testified that MCC's time sheets recorded the number of hours worked by employees on non-Community Bank projects such as Heritage Valley Farms. Odom then explained that MCC's Quickbooks records included payroll entries for each MCC employee who worked on the non-Community Bank projects. Odom matched the hours from the employees' time sheets to identical payroll entries in the Quickbooks records. By matching these records, Odom was able to testify to the fact that in Quickbooks, MCC had coded the employees' payroll amounts to Community Bank projects rather than to the non-Community Bank projects listed on the time sheets.

Based on MCC's own invoices and cashed checks, Odom testified that MCC sent invoices to Community Bank for the work done by these employees, even though the time sheets showed that the work was not done for Community Bank. Odom also presented to the jury his summations of the total number of hours from the time sheets and other records. Odom calculated the labor cost to MCC for each

32

of its projects, and then testified concerning the actual amounts MCC billed Community Bank for those projects. Odom used an Excel spreadsheet to calculate some of these figures.

Contrary to Appellants' contention, the government was not required to certify Odom as an expert witness and comply with Rule 16(a) with respect to Odom's testimony. To prepare for his testimony, Odom simply added and subtracted numbers from a long catalogue of MCC records, and then compared those numbers in a straightforward fashion. As Odom himself explained at trial, while his expertise and the use of computer software may have made him more efficient at reviewing MCC's records, his review itself was within the capacity of any reasonable lay person.[15] Therefore, Odom's testimony was permissible lay testimony under Rule 701 of the Federal Rules of Evidence. See Fed. R. Evid. 701 (allowing lay testimony as to opinions or inferences "which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the

---

[15]When considering Appellants' motion to treat Odom as an expert witness, the district court allowed Appellants to ask Odom questions about his expected testimony. Odom explained his work as follows:

[R]eviewing those time sheets, which are very elementary, they are a name and hours and dollar amounts, I can't say that what I have learned over the twenty-four years [I've been a financial analyst] would be necessary to add and subtract. . . . if you are simply looking at a stack of time sheets and you want to know how many hours a particular individual worked at a certain location over a two and a half year period, you simply flip a page and hit the adding machine. . . . If the FBI provides me a computer and a database and asked that I use that, then certainly that would save time and probably provide a better product.

33

witness' testimony or the determination of a fact in issue, and ©) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); see also United States v. Henderson, 409 F.3d 1293, 1299-1300 (11th Cir. 2005), cert. denied, __ U.S. __ , 126 S. Ct. 1331 (2006).[16]

Appellants' contention that Odom should have been classified as an expert witness is indistinguishable from a similar claim rejected by the Tenth Circuit in United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002). There, the Tenth Circuit concluded that an FBI financial analyst properly testified as a lay witness even where his testimony "summarized business records and client lists and presented them in condensed form . . . ." Caballero, 277 F.3d at 1247. As with the FBI financial analyst in Caballero, the fact that Odom is a financial expert does not in and of itself require that his testimony about financial records be treated as expert testimony.

Even if we were to agree with Appellants that Odom should have been classified as an expert witness and the government should have complied with Rule 16(a)'s disclosure requirements, "'[v]iolations of Rule 16 will result in a reversal of conviction only if such a violation prejudices a defendant's substantial rights.'"

___

[16]The Federal Rules of Evidence also acknowledge and permit the summary presentation of voluminous documentary evidence. See Fed. R. Evid. 1006 ("The contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.").

34

United States v. Chastain, 198 F.3d 1338, 1348 (11th Cir. 1999) (citation omitted).

Even before the government formally identified Odom as a witness at trial,

Appellants were aware of his role in the investigation and that he would testify to

the government's central allegation that MCC had billed Community Bank for

non-Community Bank work at Patterson's Heritage Valley Farms. Odom's

testimony was based entirely on MCC records produced by Appellants themselves,

and the district court even excluded from trial Odom's summary charts. It is

difficult to see what additional information Appellants were entitled to receive

prior to trial concerning Odom's testimony, or how classifying Odom as a lay

witness prejudiced Appellants in any way.

## D.    Sufficiency of the Evidence

Finally, Appellants assert that their convictions were not supported by

sufficient evidence.[17]  Appellants do not deny that according to MCC's own time

sheets, payroll and invoicing records, MCC charged Community Bank at what

amounted to outrageous mark-ups for the labor MCC actually performed at

Community Bank projects. Instead, Appellants contend that the government never

---

[17]We review de novo Appellants' challenge to the sufficiency of the evidence. United States v. Munoz, 430 F.3d 1357, 1367 (11th Cir. 2005), cert. denied No. 05-1328, __ U.S. __ , __ S. Ct. __ , 2006 U.S. LEXIS 3995 (May 22, 2006). "We review the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." Id.

refuted their benign explanation for these charges, namely, that MCC engaged in "front-loaded" or "pay forward" billing, charging Community Bank for work MCC had yet to perform at Community Bank sites. After considerable review of the record, we conclude that ample evidence supported the jury's verdict.

MCC's records show that over the same two-and-a-half year period that MCC was purportedly billing Community Bank for work yet to be performed, MCC actually completed hundreds of thousands of dollars of personal work for Patterson – Community Bank's president – while billing him next to nothing. Indeed, evidence at trial demonstrated that if not for MCC's supposed "front-loading" of its billing to Community Bank, MCC's cash flow would have been utterly insufficient to pay its employees for their thousands of hours of work on Patterson's personal projects.

It is theoretically possible that, as Appellants claim, MCC made a business decision simultaneously to bill Community Bank up front for future projects and to defer almost all charges to Patterson for the work MCC did for him personally. But MCC's records belie this possibility. If Appellants' claim were true, MCC would have recorded large accounts receivable for MCC's work at Heritage Valley Farms. Instead, MCC's records show not a single account receivable attributed to the Heritage Valley Farms work, nor any record of any kind of the huge debt owed

36

to them by Patterson. If Appellants' claim were true, Appellants at some point would have returned to Community Bank the many hundreds of thousands of dollars Community Bank paid for work on projects (such as Guntersville) which Appellants never completed. Appellants never made any such efforts to compensate Community Bank.

Even more revealing, the hours and dollar amounts on over a hundred invoices that MCC delivered to Community Bank match the hours and payroll amounts MCC's time sheets attribute to work MCC performed at Heritage Valley Farms. The evidence at trial also included a particularly incriminating printout from MCC's Quickbooks records, on which hand-written notes effectively identified the particular Community Bank projects which would be charged for expenses actually incurred at Heritage Valley Farms. Indeed, Linda Hamaker actually admitted at trial that she herself manipulated MCC's records to shift costs from Heritage Valley Farms to Community Bank projects, explaining lamely that she had done so merely to see "what it looked like in the computer." These records were never corrected, even several months after Linda Hamaker's purported experiment.

Despite overwhelming evidence that MCC systematically billed Community Bank for the work done for Patterson, Dewey Hamaker claimed falsely at

37

Community Bank and Bancshares board meetings that MCC never billed the Bank for work at Heritage Valley Farms. Dewey Hamaker made the same claim to William Lafferty, Community Bank's investigator. At no point until trial did either of the Hamakers explain to Community Bank or to anyone else that they were merely billing Community Bank for prospective work, nor does any documentary evidence whatsoever support that proposition.

Indeed, prior to trial, Dewey Hamaker insisted that MCC was billing Community Bank justifiably for actual and ongoing work. Only at trial did Appellants change their story, claiming to have front-loaded their billing at Bishop's instruction. Moreover, upon the FBI search of the Hamaker's home, Dewey Hamaker made a substantially incriminating statement, inquiring, "why am I the only one being punished and losing property in this thing? I wasn't the only one involved in this scheme."

Against a mountain of evidence suggesting that MCC and both Appellants willingly engaged in fraudulent billing of Community Bank, Appellants' entire theory of defense rests ultimately on the testimony of Appellants Linda Hamaker and Dewey Hamaker and their claims of innocent intentions. As we have stated many times before, "[w]itness credibility is the sole province of the jury." Snowden v. Singletary, 135 F.3d 732, 739 (11th Cir. 1998). The jury was entitled

38

to disbelieve Appellants' dubious explanations for their conduct and MCC's records, and the evidence more than supported the verdicts against Appellants.[18]

## IV. CROSS-APPEAL OF SENTENCES

The government cross-appeals Appellants' sentences, arguing that the district court misapplied the sentencing Guidelines in calculating the loss amount caused by Appellants' fraudulent conduct. In particular, the government complains that the district court improperly relied only upon the amount of the jury's verdict on the forfeiture count when calculating the loss for purposes of Appellants' sentences on Counts One and Two of the superseding indictment. We agree.

### A. Forfeiture Verdict

After finding Appellants guilty of bank fraud and conspiracy to commit bank fraud, the jury was asked to reach a verdict with respect to the forfeiture count of the indictment, Count Three. See 18 U.S.C. § 982(a)(2)(A). Section 982 requires that a defendant convicted of bank fraud forfeit to the United States any

_____

[18]We also reject Appellants' claim that the government presented no evidence of conspiracy. For one, Appellants themselves admitted at trial that Bishop, an unindicted co-conspirator, participated in directing their fraudulent billing practices. Moreover, conspiracy requires only that "two or more persons conspire . . . to commit any [federal] offense . . . ." 18 U.S.C. § 371. "[T]he presence of an agreement is the primary requirement for the establishment of a conspiracy, the commission of an overt act in furtherance being attendant." United States v. Perez, 489 F.2d 51, 61 (5th Cir. 1973). Dewey Hamaker and Linda Hamaker have never denied agreeing – at least with each other – on MCC's billing practices. It is equally clear that both Dewey Hamaker and Linda Hamaker committed overt acts in furtherance of their deception of Community Bank.

property the defendant obtained directly or indirectly as a result of that bank fraud violation. 18 U.S.C. § 982(a)(1).

The district court instructed the jury that it would have to decide the value of the property Appellants obtained in connection to "the bank fraud violation [of] which you have already found the defendants guilty." The district court explained that the jury need only base its forfeiture finding upon the preponderance of the evidence, as opposed to on facts proven beyond a reasonable doubt, and that the jury was bound by its finding of guilt on the fraud charges. See United States v. Hasson, 333 F.3d 1264, 1277 (11th Cir. 2003) (noting that the elements of forfeiture under 18 U.S.C. § 982(a) must be proven only by a preponderance of the evidence).

The district court informed the jury that the government sought a money judgment of $1,686,407, which the government believed constituted the value of proceeds derived from the defendants' fraud violation, but that it was the jury's responsibility to reach its own determination regarding the proper amount. The government then presented its case. Referencing trial testimony from financial analyst Odom, the government argued that the defendants had received $3,122,977 in revenues from Community Bank, the victim of their fraud. Of that amount, 54% was, according to the government, fraudulently presented to the bank in the form

40

of false construction invoices.

Appellants, in contrast, asked the jury to consider just how much of the money charged was for illicit purposes, because at many of the construction sites, the defendants performed actual work and actual labor, resulting in actual, tangible constructions that were of good quality. Appellants asked the jury to separate out money they received legitimately and pointed to their tax returns as proof that they received little to no profit from any fraudulent activity.

After closing arguments, the district court met with the parties' counsel and formulated an additional jury instruction that it read to the jury as follows:

> As you have heard[,] the government claims approximately one point six million dollars to be forfeited based on the Heritage Valley Farm fraud. . . . If, however, the basis of your guilty verdict under count two was fraud other than for work done on Heritage Valley Farms, then your verdict of forfeiture must be based on the value of that fraud or based on the amount of proceeds directly attributable to that fraud; that is, the amount of your forfeiture verdict should be connected to the basis of your verdict of guilty of bank fraud.

No objections were lodged to the jury instruction. The jury returned a forfeiture verdict of $178,500.

## B. Loss Calculation

For sentencing purposes, the PSIs estimated that Community Bank had suffered approximately $2,000,000 in losses as a result of Appellants' criminal conduct. The evidentiary foundation for this amount was quite similar to the

41

evidence presented to the jury for determining forfeiture. Based on the $2,000,000 loss amount, the government advocated that Dewey Hamaker and Linda Hamaker should be assigned a twelve-level loss enhancement, see U.S.S.G. §2F1.1(b)(1)(M), and a four-level enhancement for gross receipts of over $1,000,000 from an offense affecting a financial institution, see U.S.S.G. §2F1.1(b)(7)(B).

At sentencing, the district court rejected the government's loss calculation and settled upon a loss amount of $178,500, the exact amount of the jury's forfeiture verdict. The district court explained that

> I stand by the decision that I made in February, as to the evidence of guilt, and because the only allegations that the government proved at trial beyond a reasonable doubt involved the Guntersville project, then the Court must determine the loss incurred by the bank on that project, not the total loss alleged by the government for allegations of fraud that were not proven at trial to the satisfaction of the jury.

The $178,500 loss calculation warranted only a seven-level loss enhancement, see U.S.S.G. § 2F1.1(b)(1)(H), and no enhancement for gross receipts over $1,000,000 from a financial institution, yielding a total offense level of 15. The resulting Guidelines range was 18 to 24 months' imprisonment. The district court sentenced the Hamakers to terms of 18 months' imprisonment.

## C. Discussion

On cross-appeal, the government argues that the district court improperly

42

treated the jury's forfeiture verdict as a special interrogatory defining the scope of Appellants' criminal conduct. The government insists that because forfeiture and loss calculation are distinct, the district court misapplied the Guidelines and Appellants must be resentenced. We agree.[19]

After United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), the U.S. Sentencing Guidelines are no longer mandatory. Even so, district courts must continue to consult the provisions of the Sentencing Guidelines and to consider them in sentencing. United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005); United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir.), cert. denied, __ U.S. __ , 126 S. Ct. 812 (2005). "This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the Guidelines." Crawford, 407 F.3d at 1178 (emphasis added).

To calculate correctly Appellants' Guidelines range in this bank fraud case, the district court was required to calculate properly the amount of loss pursuant to U.S.S.G. § 2F1.1(b). Although district courts now consider the Guidelines only in an advisory fashion, U.S.S.G. § 1B1.3 instructs district courts to consider not merely the charged conduct, but rather all "relevant conduct," in calculating a

---

[19]We review the district court's interpretation and application of the sentencing Guidelines de novo, and its loss calculation for clear error. United States v. Machado, 333 F.3d 1225, 1227 (11th Cir. 2003).

43

defendant's offense level.  See Black v. United States, 373 F.3d 1140, 1143 (11th Cir. 2004) (citing U.S.S.G. § 1B1.3 and Edwards v. United States, 523 U.S. 511, 118 S. Ct. 1475 (1998)).  "[S]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence." Hasson, 333 F.3d at 1279 n.19; see also United States v. Behr, 93 F.3d 764, 765-66 (11th Cir. 1996) (even conduct that took place outside a relevant statute of limitations period may be factored into the loss calculation for sentencing purposes).  Further, the preponderance-of-the-evidence standard, not the beyond-a-reasonable-doubt standard, still applies to Guidelines calculations after Booker, including the calculation of loss amounts.  United States v. Duncan, 400 F.3d 1297, 1304-05 (11th Cir.), cert. denied, __ U.S. __ , 126 S. Ct. 432 (2005).

As the district court noted at sentencing, $178,500 – the amount of the jury's forfeiture verdict – was the exact amount MCC billed Community Bank between February 9, 2000 and June 20, 2000 for work MCC purportedly did at Guntersville.  Because the jury's forfeiture verdict in Count Three was identical to the sum of these Guntersville invoices, the district court surmised that in Counts One and Two, the jury had found Appellants guilty of defrauding Community Bank only with respect to the Guntersville project.  Based on this interpretation of the jury's verdict, the district court rejected the government's estimate of loss and

44

arrived at a $178,500 loss amount identical to the jury's forfeiture verdict.  The

district court asserted that "because the only allegations that the government

proved at trial beyond a reasonable doubt involved the Guntersville project, then

the Court must determine the loss incurred by the bank on that project, not the total

loss alleged by the government for allegations of fraud that were not proven at trial

to the satisfaction of the jury."[20]

There are three problems with the district court's reliance on the jury's

forfeiture verdict in determining the correct loss amount under the sentencing

Guidelines.  First, although forfeiture and loss bear similarities and are determined

under the same burden of proof,[21] the two require distinct calculations and need not

be calculated identically.  Criminal forfeiture is a form of punishment imposed by

the jury to divest a defendant of the profits of his illegal activity.  See 18 U.S.C. §

982(a).  Loss, on the other hand, focuses generally on the harm suffered by the

victim of the criminal conduct rather than on the proceeds of the crime enjoyed by

the defendant.  See United States v. Snyder, 291 F.3d 1291, 1295-96 (11th Cir.

2002).  Because "'[f]orfeiture is a penalty imposed on a criminal independent of

---

[20]At the post-trial hearing with respect to the withheld documents, the district court reiterated its conclusion that the jury's forfeiture finding was, "in essence, a direction as to the jury's determination of guilt based on the Guntersville transaction only."

[21]The preponderance-of-the-evidence standard applies to a jury's forfeiture verdict under § 982(a)(1).  Hasson, 333 F.3d at 1278.

45

any loss to the crime victim,'" the amount of the jury's forfeiture verdict is not necessarily the correct measure of loss for sentencing purposes, and the procedures for arriving at a forfeiture amount and calculating loss are distinct. United States v. Dawkins, 202 F.3d 711, 715 (4th Cir. 2000) (citation omitted). Thus, the district court erred to the extent it assumed that the forfeiture verdict necessarily dictated the loss amount as well.

Second, the district court improperly treated the jury's forfeiture verdict of $178,500 on Count Three as a special verdict as to the scope of Appellants' fraudulent conduct in Counts One and Two. At root, the district court's loss calculation was based on its speculation as to what the jury's forfeiture verdict implied as to the jury's view of Appellants' overall guilt on the bank fraud and conspiracy charges. Based on the forfeiture verdict in Count Three, the district court assumed that the jury had found Appellants' guilty of only a subset of the fraudulent conduct alleged by the government, and arrived at the $178,500 loss amount largely based on this assumption.

However, the forfeiture verdict on Count Three was not a special interrogatory or a special verdict as to Counts One and Two. The jury's forfeiture verdict contains no information apart from the $178,500 dollar amount itself, information wholly insufficient to establish the rationale for the jury's verdict on

46

Counts One and Two. Absent an explicit special verdict explaining the specific grounds for the jury's finding of guilt on the Count One and Two conspiracy and fraud charges, the district court's speculation as to the reasoning behind the jury's general verdict on those counts was improper. See Mars v. Mounts, 895 F.2d 1348, 1357 (11th Cir. 1990). Where the jury returns a general verdict of guilty, as it did on Counts One and Two, the basis for the jury's verdict is not known, and theorizing about the jury's views threatens to invade the sacred province of the jury. See United States v. Allen, 302 F.3d 1260, 1269 (11th Cir. 2002) (citing with approval United States v. Orozco-Prada, 732 F.2d 1076, 1083 (2d Cir. 1984), for the proposition that a judge has no way to interpret the jury's underlying intent in the absence of a special verdict); Fallada v. Dugger, 819 F.2d 1564, 1566 (11th Cir. 1987). As such, the district court erred by extrapolating from the forfeiture verdict a broader estimation of the jury's views on the underlying charges.

Third, regardless of what motivated the jury's verdict of guilt and its forfeiture determination, the sentencing Guidelines require a district court, at the sentencing stage, to make independent findings establishing the factual basis for its Guidelines calculations. See Fed. R. Crim. P. 32(i)(3)(B); see also United States v. Ndiaye, 434 F.3d 1270, 1300 (11th Cir. 2006); United States v. Nelson, 356 F.3d 719, 722 (6th Cir. 2004) (stating that Rule 32(i)(3)(B) "ensure[s] that sentencing is

47

based on reliable facts found <u>by the court itself</u> after deliberation") (emphasis added) (quotation marks and citation omitted); <u>see also</u> <u>United States v. Love</u>, 134 F.3d 595, 605 (4th Cir.1998) (citing U.S.S.G § 1B1.3 for the proposition that a "district court has a separate obligation . . . to make independent factual findings regarding relevant conduct for sentencing purposes"). The district court should have assessed independently the relevant loss for sentencing purposes rather than deferring to the jury's view of the scope of Appellants' guilt, or rather to the district court's speculation as to the jury's view of the scope of Appellants' guilt. "'The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing.'" <u>Ndiaye</u>, 434 F.3d at 1300 (citation omitted). While the district court rightly considered the financial evidence underlying the jury's forfeiture verdict, the district court erred as a matter of law by considering the forfeiture verdict itself. The jury's forfeiture verdict was not itself evidence as to the proper loss calculation for sentencing purposes.

Accordingly, we vacate Appellants' sentences and remand for resentencing consistent with this opinion. On resentencing, we emphasize that "[t]he limits of sentencing accountability are not coextensive with the scope of criminal liability . . . ." <u>United States v. Hunter</u>, 323 F.3d 1314, 1319 (11th Cir. 2003). As mentioned

above, all of Appellants' relevant conduct, including acquitted conduct and conduct not mentioned in the superseding indictment, may be considered at sentencing. See United States v. Exarhos, 135 F.3d 723, 730 (11th Cir. 1998); United States v. Munio, 909 F.2d 436, 438-39 (11th Cir. 1990). Moreover, the government need only prove facts relevant to the loss calculation by a preponderance of the evidence, rather than beyond a reasonable doubt, as required for the underlying criminal convictions. United States v. Futrell, 209 F.3d 1286, 1290-92 (11th Cir. 1992). Thus, while the district court, as the fact finder at sentencing, retains broad discretion in calculating loss, the district court should not per se restrict its loss calculation to the Guntersville project.[22]

---

[22]On remand, the previously withheld documents may be considered to whatever extent they pertain to the two remaining sentencing issues, but they shall not be used to revisit Appellants' convictions on Counts One and Two. We clarify this because in denying Appellants' Brady and Jencks Act claims, see Part III.B, supra, the district court emphasized that it denied these claims solely because none of the withheld material related to the Guntersville project. The district court stated that "if [the district court] erred in finding inadequate evidence to support a conviction or require consideration of the broader conspiracy allegations in sentencing, then a more thorough analysis should be done concerning the suppressed documents as a whole and the cumulative effect that information could have had on those broader issues at trial."

However, we conclude, see Part III.B, supra, that the non-disclosure of the documents did not prejudice Appellants in any way. Furthermore, even the district court acknowledged that as to the Guntersville allegations, the non-disclosure did not prejudice Appellants. Because the Guntersville allegations in and of themselves are wholly sufficient to support Appellants' convictions for bank fraud and conspiracy, the documents' hypothetical relevance to some other subset of the conduct charged in Counts One and Two is irrelevant to Appellants' convictions on Counts One and Two.

More importantly, this Court has thoroughly reviewed the documents themselves. We find without difficulty that the documents in no way support Appellants' arguments for acquittal or a new trial, claims which we have rejected finally in this opinion.

## V. CONCLUSION

For the reasons set forth above, we affirm Appellants' convictions, vacate their sentences, and remand for resentencing consistent with this opinion. The district court properly applied the Guidelines on all matters except for the loss calculation, <u>see</u> U.S.S.G. § 2F1.1(b)(1)(M), and potentially the enhancement for gross receipts of over $1,000,000 from an offense affecting a financial institution, <u>see</u> U.S.S.G. § 2F1.1(b)(7)(B). Thus, the district court should only revisit these two sentencing issues at resentencing.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART WITH INSTRUCTIONS.**