[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 20, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-10868

_____

D. C. Docket No. 03-00531-CR-2-SLB-TMP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JIMMIE D. CHILDERS,
KENNON R. PATTERSON, SR.,
LARRY E. BISHOP,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(November 20, 2007)

Before TJOFLAT, HULL and WILSON, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendants-appellants Kennon R. Patterson, Sr. ("Patterson"), Larry E. Bishop ("Bishop"), and Jimmie D. Childers ("Childers") appeal their convictions for bank fraud conspiracy and related offenses. Patterson and Bishop also challenge the restitution portion of their sentences. After review and oral argument, we affirm.

## I. BACKGROUND[1]

### A. The parties

Defendant Patterson was the CEO and Chairman of the Board of Community Bank, a federally-insured financial institution headquartered in Blountsville, Alabama. Patterson was also the CEO and Chairman of the Board of Community Bancshares, Inc. ("Bancshares"), the holding company for Community Bank.

Additionally, Patterson (personally) owned and operated Heritage Valley Farms ("HVF"), a 1000-acre horse and cattle farm located in Blountsville. In 1998, Patterson commenced construction of a 17,000-square-foot mansion at HVF, which was to serve as his personal residence. Beyond HVF, Patterson had ties to several other pieces of personal property: a mobile home in Auburn, Alabama,

---

[1]Defendants challenge the sufficiency of the evidence presented against them at trial, and because Defendants were convicted, we recount the facts in the light most favorable to the government. See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

where his son lived; a parcel of land in Blount County, Alabama, known as Royal Acres that Patterson co-owned with another individual; and a house in Leeds, Alabama that was owned and occupied by Patterson's mother. As explained below, defendants' convictions in this case arise out of the fraudulent billing of Community Bank for construction work performed for Patterson at HVF and at Patterson's other personal properties.

Defendant Bishop was Community Bank's Vice President of Construction and Maintenance. Bishop was hired in the mid-1990s, and he essentially served as the "in house" general contractor on various ongoing Community Bank construction projects throughout Alabama. Bishop chose which subcontractors worked on Community Bank's construction projects, communicated with the subcontractors on an ongoing basis, and approved all subcontractors' invoices for payment by Community Bank.

Bishop also acted as the general contractor for work performed at Patterson's HVF. Bishop received nominal payments—approximately $5000 per year—from Patterson during the course of the HVF construction, and Patterson promised Bishop that he would be "well compensated" upon the project's completion.

Defendant Childers owned and operated J&M Materials, Inc. ("J&M"), one

of the subcontractors hired by Bishop.  J&M performed various construction services on several Community Bank projects and at HVF.  J&M's two biggest customers were Patterson and Community Bank.

Separately indicted co-conspirators Dewey and Linda Hamaker owned and operated Morgan City Construction, Inc. ("MCC").  MCC, like J&M, provided construction services for various Community Bank projects and HVF.  In addition, MCC provided construction services on two of Patterson's other personal properties.  Cf. United States v. Hamaker, 455 F.3d 1316, 1319 (11th Cir. 2006).[2]

## B.    Offense conduct

Again, defendants' convictions arise out of a scheme to fraudulently bill Community Bank for construction work performed for Patterson at HVF and his other personal properties, and to have Community Bank—rather than Patterson—pay for the bulk of that work.  Defendant Bishop, as the general contractor on both Community Bank's construction projects and Patterson's personal construction projects, acted as the intermediary and facilitated Community Bank's payment of Patterson's personal projects.

Because the scheme involved several subcontractors, some of whom were

---

[2]The Hamakers were separately indicted, tried, and convicted.  Further details about this same Community Bank scheme can be found in Hamaker, in which this Court affirmed the Hamakers' convictions for their roles in the scheme.

indicted and others of whom were not, and because the activity of the subcontractors impacts our analysis of defendants' convictions, we detail the relevant conduct of each subcontractor and explain how that conduct pertains to each defendant.

### 1. MCC

MCC, owned and operated by the Hamakers, fraudulently billed Community Bank for hundreds of thousands of dollars worth of construction services that MCC performed for Patterson. See also Hamaker, 455 F.3d at 1319. According to the evidence presented at the trial of these three defendants, the MCC component of the scheme worked as follows.

MCC recorded the number of hours worked by each construction employee, as well as the location at which each employee performed the work, in a computerized accounting system called Quickbooks. MCC's Quickbooks records included accounts for each of MCC's individual construction projects, and documented the materials, labor, and other costs that MCC incurred on each particular project.

Between 1995 and 2001, MCC provided construction services at Community Bank branches throughout Alabama, as well as services at a site in Tennessee. Additionally, beginning in late 1997, MCC began providing services at

defendant Patterson's HVF.

Between January 1, 1998 and July 15, 2000, MCC billed and received from Community Bank a total of $3,122,977 for work reportedly done on several Community Bank construction projects. The trial evidence established that MCC—even accounting for price mark-ups in accordance with MCC's "cost-plus" billing arrangement[3]—overbilled Community Bank by over $1.6 million. In the meantime, MCC barely billed Patterson at all while performing substantial work on HVF and Patterson's other personal properties.

For example, of the more than $3 million that MCC invoiced to Community Bank, MCC attributed approximately $500,000 to work performed at Community Bank's Guntersville, Alabama branch. However, MCC's records established that MCC incurred only approximately $30,000 in direct labor costs on the Guntersville project. MCC was due approximately $48,000 for such work after its "cost-plus" mark-ups, but MCC submitted, Bishop approved, and Community Bank paid invoices totaling $484,750 for work at Guntersville—more than ten times the amount actually due.

Moreover, MCC's records established that MCC incurred no labor costs at

---

[3]MCC and Community Bank agreed to a "cost-plus" billing agreement whereby MCC's labor costs were used as a benchmark and then percentage markups were added for workers' compensation, taxes, overhead, and profit.

all on the Guntersville project between February 9, 2000 and June 20, 2000. MCC nevertheless invoiced Community Bank for $178,500 of work purportedly done at the Guntersville site during that time, and Bishop approved and Community Bank paid those invoices as well.

By contrast, over the same two-and-a-half year period, MCC received only $10,000 from defendant Patterson for MCC work performed at HVF.[4] MCC received this relatively small amount of compensation despite the fact that MCC's Quickbooks records reflect that MCC employees worked over 61,000 hours at Patterson's personal HVF during that time period, incurring a total labor cost of $691,359.58. In other words, "during the same time frame in which MCC billed Community Bank over 1600% of the labor costs at the Guntersville project, MCC received from Patterson less than 1.5% of the labor costs at [Patterson's] Heritage Valley Farms." Hamaker, 455 F.3d at 1320-21.

Additionally, at Community Bank's Albertville, Alabama site, MCC

---

[4]MCC sent Patterson two invoices during this period: a December 28, 1998 invoice for $37,500, and an April 21, 1999 invoice for $10,000. The government presented evidence that Patterson only paid MCC $10,000 prior to the discovery of the conspiracy in approximately June-July 2000. The government also presented evidence that Patterson requested the $37,500 invoice from MCC in the latter part of 1998. At that time (November-December 1998), certain Bancshares stockholders threatened and ultimately filed a shareholder derivative suit in which it was alleged that Community Bank funds were being spent improperly. (This shareholder derivative suit is referred to infra as the "Townes litigation.") In other words, the government presented evidence that, viewed in the light most favorable to the government, established that Patterson only requested the $37,500 invoice in late 1998 in response to the Townes litigation.

7

incurred approximately $70,000 in direct labor costs, which should have equated to about $110,000 in invoices under the "cost-plus" arrangement. Instead, MCC billed Community Bank approximately $585,000 for the Albertville project. Just as with the Guntersville project, Bishop approved MCC's Albertville invoices, and Community Bank paid the full overcharge of approximately $475,000.

Further evidence of MCC's fraudulent billing of Community Bank was introduced in the form of handwritten entries made on a printout of MCC's Quickbooks records. On a November 9, 1998 report reflecting numerous printed entries for labor costs and expenses on HVF-related projects, there were handwritten entries in the margins next to each HVF project that bore the names of various Community Bank projects. MCC administrative employee Tina Rogers testified that she made the handwritten notes next to the HVF-related entries at the direction of Linda Hamaker. Comparison of the November 1998 report with data found in MCC's computer systems in 2000 revealed that each entry from the HVF-related accounts was subsequently shifted to Community Bank accounts, and Community Bank was invoiced to cover those charges.

Finally, evidence established that MCC charged Community Bank not only for HVF-related work, but also for work performed at other personal properties connected to Patterson. MCC employees performed construction services on

8

Patterson's Royal Acres property in Blount County, Alabama in March 2000, and at Patterson's mother's house in Leeds, Alabama in 1999. Former MCC employees testified that Bishop directed them to work on both the Royal Acres and Leeds sites.

### 2. J&M

Again, defendant Childers owned and operated J&M. J&M itself performed excavating and hauling services at certain Community Bank locations and at HVF, and J&M subcontracted other excavating and hauling services at those locations.

Between January and July 2000, J&M submitted approximately $325,000 in invoices to Community Bank for construction services purportedly performed at Community Bank's Guntersville and Albertville locations. Evidence established that J&M (and its subcontractors) performed little work at those Community Bank sites during that time, but a great deal of work at HVF. Nevertheless, the approximately $325,000 in invoices from J&M were approved by Bishop and paid by Community Bank.

The three subcontractors hired by J&M to perform work at Community Bank's Guntersville and Albertville locations testified at trial. One of the subcontractors stated that he completed work on all Guntersville and Albertville projects by December 1999; the other two subcontractors testified that they

invoiced Childers for a total of approximately $68,000 in work performed at those sites between January and June 2000. Moreover, the subcontractors stated that they rarely, if ever, saw Childers or any other J&M employee on site at the Guntersville and Albertville locations, and former J&M employees confirmed that they performed little work at the Guntersville and Albertville locations between January and July 2000. By contrast, the government presented testimony that J&M and its subcontractors performed extensive work at HVF in 1999 and 2000.

In addition, the government presented evidence of two false charts created at Childers's direction that purported to show construction services performed by J&M. The charts, which were prepared as the scheme was being discovered, reflected that J&M had performed hundreds of thousands of dollars of construction services at the Guntersville and Albertville sites. However, Russell Speegle, a former Childers employee, testified that upon beginning work for Childers in June 2000—around the time the scheme was being discovered—he was assigned the task of preparing the charts. Speegle testified that Childers gave him a list of invoices and instructed him to "fabricate" hours worked, so that the hours reflected on the charts would be roughly commensurate with the amounts billed. Speegle explained that in making the charts, he never reviewed any J&M time sheets, general ledger entries, or evidence reflecting the amount of time J&M machines

10

were in use.  Speegle further testified that he never spoke to any other J&M

employees or contacted any of J&M's subcontractors before making the charts.

### 3.  Defendants' other fraudulent conduct

The government also presented evidence that Bishop directed other

contractors to bill Community Bank for work performed on HVF and Patterson's

other personal properties.

### a.  CAC

The architectural firm of Coker, Anderton & Cosper ("CAC") provided

services for HVF and for various Community Bank projects.  In early 1998, when

CAC was first approached by Patterson and Bishop to work on HVF and

Community Bank projects, CAC set up separate billing numbers and separately

invoiced the work it performed for HVF and Community Bank.  However, Wesley

Anderton, one of the principals of CAC, testified that in May 1998, CAC was

instructed by defendant Bishop to combine all work for HVF and Community

Bank on one invoice.  CAC complied with Bishop's directive, although Anderton

testified that CAC found Bishop's request "rather strange."  As such, CAC began

to combine its charges for HVF and Community Bank on one invoice as directed

by Bishop, but CAC persisted in submitting cover sheets in which the charges were

separated by each job.

Bishop then removed the explanatory sheets from the invoices, approved them, and submitted them to Community Bank for payment.[5]  The government submitted evidence that Community Bank paid approximately $35,000 in charges for CAC work on HVF projects between May 1998 and November 1998.

In approximately November 1998, at Bishop's request, CAC began to provide separate invoices for Community Bank and HVF work.  Bishop also asked CAC to provide a separate breakdown of costs incurred on Community Bank and HVF projects between May 1998 and November 1998.  Anderton testified that Bishop told CAC that the original, lump-sum billing arrangement had been a "mistake."  By approximately March 1999, the money originally paid by Community Bank for CAC work at HVF had been refunded to the Bank.

However, the government presented evidence that in approximately November 1998—i.e., at the same time Bishop instructed CAC to ignore his original lump-sum billing directive and to start separating HVF and Community Bank charges again—certain Bancshares stockholders threatened and then filed a shareholder derivative lawsuit.  This lawsuit, known as the "Townes litigation," questioned the general manner in which Community Bank funds were being spent.

_____

[5]Occasionally, the combined invoices would contain relatively small charges that were specifically attributed to miscellaneous expenses incurred at HVF.  Bishop paid those amounts by separate check; the government's theory is that Bishop did this "so as not to arouse suspicion by Community Bank's accounts payable department."

12

William Caughren, who was the general counsel of Community Bank in 1998, testified that he met with Patterson and Bishop in November or December 1998 to discuss the Townes litigation. According to Caughren, during that meeting, Patterson said to Bishop that "the next thing that . . . Townes would raise a concern about was the building of [Patterson's] house." Caughren further testified that Bishop agreed with Patterson, and that Caughren then assisted Patterson "in draft[ing] some statements for the contractors to sign, stating that they were keeping the two projects [i.e., HVF work and Community Bank work] separate."

### b. L&L

Lighting and Lamp Wholesalers, Inc. ("L&L") provided light fixtures for HVF and for Community Bank projects. When Bishop began doing business with L&L, he did not request separate accounts, and when L&L supplied fixtures for HVF, the invoices for the fixtures were submitted to and paid by Community Bank.

In November 1998, after commencement of the Townes litigation, Bishop opened a separate account for HVF, and thousands of dollars were refunded to Community Bank's L&L account.

Moreover, on an L&L invoice from September 1998, charges were specifically marked as having been incurred by L&L at the "Arena" at HVF.

13

Nevertheless, Bishop crossed out the "Arena" designation and wrote in "Demopolis," which is the name of a Community Bank branch that was under construction in Demopolis, Alabama. Bishop approved the invoice for payment by Community Bank, and Community Bank paid accordingly.

### c.     Langford

C.A. Langford Company, Inc. ("Langford") provided stone materials for both Community Bank projects and HVF. In October 1997, Bishop opened a single account with Langford, in the name of Community Bank. Bishop routinely asked Langford to provide materials to be billed to that account, and Bishop then provided driving directions to the specific locations where he wanted the materials delivered. The directions often led to HVF. Moreover, Langford drivers often were directed to deliver materials to Community Bank's headquarters in Blountsville and then re-directed to HVF upon their arrival.

In December 1998, shortly after the Townes litigation began, Bishop directed Langford to create separate accounts for Community Bank and HVF.

### d.     Sheffield

Sheffield Electrical Contractors, Inc. ("Sheffield") also provided construction services for HVF and Community Bank projects. In December 1998, Bishop directed three Sheffield employees to travel to Auburn, Alabama to

14

perform services on a trailer then occupied by Patterson's son. Patterson's son testified that he did not hire or pay Sheffield for the work that was performed.

At the time Bishop directed Sheffield to perform the work for Patterson's son, neither Patterson nor Bishop maintained personal accounts with Sheffield; Community Bank had the sole account. Bishop never told Sheffield's personnel to bill the Auburn work separately, and the services provided at Auburn were billed to and paid for by Community Bank.

### e. Avant

Avant Painting ("Avant") also provided construction services for HVF and Community Bank projects. In September 1998, Bishop directed Avant to paint Patterson's son's trailer in Auburn. Avant did so, and the cost was billed to Community Bank and paid after Bishop's approval. Patterson's son testified that he never hired nor paid Avant for the painting work.

## C. Discovery of the conspiracy

On June 20, 2000, at a Community Bank board meeting, several directors raised questions about the progress of the Guntersville project. Michael Alred, an executive vice president and board member, noted that over $700,000 had been spent on the site (beyond land acquisition costs), yet nothing had been built above-ground. Defendant Patterson expressed his surprise and pledged to investigate.

On July 11, 2000, Patterson asked Community Bank director Wayne Washum to come to Patterson's office. Patterson recorded their conversation, unbeknownst to Washum. Patterson asked Washum several times for the identity of those who were raising questions about the Guntersville project, and after learning that Alred was among the group, Patterson stated several times that Alred "need[ed] to be fired."

On July 15, 2000, at Patterson's request, the board of Bancshares (the holding company for Community Bank) convened a special meeting. Bishop, Childers, and Dewey Hamaker (one of MCC's principals) attended, and each denied that there had been any wrongdoing in the invoicing of Community Bank. Notably, Dewey Hamaker stated at this meeting that he invoiced Patterson "about every six months" for the work that MCC performed at HVF. In actuality, as noted supra at note 4, over the approximately thirty-month period between January 1998 and July 2000, MCC billed Patterson twice, and one of the invoices was never paid.

During the July 15, 2000 Bancshares board meeting, local sheriffs executed a search warrant at MCC's offices, seizing time sheets, other documents, and computers. MCC's computer records and time sheets were admitted into evidence in this case.

16

On July 17, 2000, MCC invoiced defendant Patterson for approximately $50,000 of work performed at HVF—the first invoice that MCC had sent Patterson since April 1999. MCC then sent Patterson twenty-nine invoices over the next five months, totaling over $460,000. These invoices sought payment for construction services performed years earlier, as far back as 1998. Patterson paid each of the invoices.

On July 18, 2000, the Community Bank board met, and three board members—Alred, Michael Bean, and George Barnett—voiced concerns about the Guntersville project. Defendants Bishop and Childers, along with Dewey Hamaker, attended this meeting as well. Hamaker told the board that MCC had not billed Community Bank for services provided at HVF; Childers told the board that he had not billed Community Bank for HVF services; and Bishop assured the board that no improper conduct had occurred.

Immediately thereafter, defendant Patterson met with Community Bank's general counsel, Bancshares's general counsel, and an outside lawyer for Community Bank, and sought approval to fire Bean. It was strongly recommended that Patterson not fire Bean; nevertheless, Patterson convened a meeting of Community Bank's executive committee and raised concerns about the ability of Alred and Bean "to perform their normal duties during the investigation" into the

17

Guntersville project.

Shortly after the Community Bank executive committee meeting, Alred and Bean were reassigned to new positions at Community Bank. In September 2000, Alred, Bean, and Barnett were removed from the board, and in November 2000, Alred and Bean were fired. In a deposition given in a civil suit filed by Alred and Bean, defendant Patterson asserted that he did not know why Alred and Bean were fired and that he tried to remove himself entirely from the firing process.

In July 2000, several Bancshares shareholders filed a derivative action against the company (the "Benson litigation"), in which it was alleged that Patterson, Bishop, the Hamakers, and others harmed Community Bank by fraudulently using bank funds for non-bank purposes. The Community Bank and Bancshares boards formed a committee (the "Benson Special Litigation Committee") to investigate the allegations raised in the Benson litigation.

The three defendants in this case—Patterson, Bishop, and Childers—were interviewed and deposed in connection with the Benson litigation and other ensuing lawsuits and investigations, and their statements in those interviews and depositions are relevant to the allegations in this case, as follows.

During his interview with the Benson Special Litigation Committee, defendant Patterson asserted that he did not pay MCC on an ongoing basis for their

18

work at HVF because the parties agreed that MCC would "hold the bill" until the work was completed. Patterson reasserted this claim during a deposition, stating that defendant Bishop told him that the Hamakers preferred a lump sum payment at the conclusion of the job.

Financial statements prepared by the Hamakers and Patterson during the relevant time period contradict this claim. The Hamakers never listed any account receivable for HVF on any financial statement. In fact, when they applied for a general contractor's license in December 1998, the Hamakers had an incentive to declare the highest amount of accounts receivable possible, in order to qualify for a license on larger projects, but the Hamakers still listed no money owed by Patterson.

Likewise, Patterson's financial statements for 1998, 1999, and 2000 list no account payable to MCC or the Hamakers, and Patterson's accountant testified that when he communicated with Patterson to prepare those financial statements, Patterson never stated that he owed the Hamakers any money.

When defendant Bishop was asked about MCC's December 1998 invoice sent to Patterson, he first told bank regulators, in August 2000, that he could not speak to MCC's billing practices. Then, in a later deposition, Bishop stated that he had personally requested that the December 1998 invoice be sent. Finally, Bishop

19

told an FBI special agent that he had <u>not</u> requested the invoice.

As for defendant Childers, the two false charts discussed earlier (created by Speegle, at Childers's direction) were submitted to the <u>Benson</u> Special Litigation Committee.

Finally, when asked in a civil deposition about the nature of his relationship with Dewey Hamaker, defendant Patterson stated that he barely knew Hamaker and could not recall any conversations with him. However, the government adduced evidence in this case that after the Hamakers were indicted in May 2002 and received court-appointed counsel, Patterson took numerous steps to help the Hamakers be able to afford private counsel.

Patterson first contacted a law firm that provided outside legal services to Community Bank and secured an opinion from the law firm that payment of the Hamakers' legal expenses by Bancshares would not be illegal. The proffered reason for payment of the Hamakers' legal fees was that publicity resulting from their prosecution could lead to a fatal run on Community Bank. The Bancshares board was presented with this idea at a board meeting on July 2, 2002, and ultimately rejected it. Nevertheless, Patterson continued to work toward funding the Hamakers' defense. On July 11, 2002, Patterson informed the same outside law firm that he had been approached by the pastor at his church with an offer to

20

help the Hamakers. The law firm then put Patterson's pastor in contact with Colonial Bank, another of the firm's clients, to see if Colonial Bank would loan money to the church to pay the Hamakers' fees. In early August 2002, Colonial Bank agreed to make a $200,000 loan to the church, the stated purpose of which was "to begin improvements to church property." Colonial Bank was not told that the purpose of the funds was to pay for the Hamakers' defense.

After the loan was funded, Patterson's pastor disbursed $50,000 to Hamaker Construction Company ("HCC"), an entity formed by the Hamakers' son. HCC purportedly had a contract to perform construction services at Patterson's church, but HCC never performed any such services. Instead, HCC transferred the money to Walter Braswell, the Hamakers' trial counsel.[6]

## D.    Indictment

Patterson, Bishop, and Childers were charged in a twenty-five count superseding indictment returned in September 2004. Count 1 charged all defendants with conspiring to defraud Community Bank, to misapply bank funds, to make false entries in bank books and records, and to make false statements to the Bank, in violation of 18 U.S.C §§ 371 and 2. Counts 2-4 charged all

---

[6]The government made clear before the district court and in its brief before this Court that it does not believe that Braswell knew the source of his payments or engaged in any wrongdoing.

defendants with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2.  Counts 5-7

charged all defendants with making false statements in bank books and records, in

violation of 18 U.S.C. §§ 1005 and 2, and Counts 8-13 charged only Patterson and

Bishop with making false statements in bank books and records, in violation of

those same statutes.  Counts 14-19 charged Patterson alone with making false

statements in loan applications, in violation of 18 U.S.C. §§ 1014 and 2; Counts

20-21 charged Patterson alone with money laundering, in violation of 18 U.S.C. §§

1957 and 2; and Counts 22-23 charged Patterson alone with making false

statements on tax returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2.

Count 24 sought criminal forfeiture from all three defendants.

**E.     Trial**

Each of the defendants pleaded not guilty, and in January 2005, the case

proceeded to trial.  The government presented evidence as described above.  In

March 2005, the jury found Patterson guilty on all counts except those counts

charging false statements in loan applications (Counts 14-19) and those counts

charging money laundering (Counts 20-21).[7]  The jury found Bishop and Childers

guilty of all counts against them.

**F.     Sentencing**

[7]The money laundering counts (Counts 20-21) against Patterson were dismissed, on the government's motion, prior to trial.

In December 2005, the district court sentenced Patterson. With an offense level of 30 and a criminal history category of I, Patterson's advisory guidelines range was 97-121 months' imprisonment. After consideration of the 18 U.S.C. § 3553(a) factors, the district court imposed a downward variance: 60 months' imprisonment on the conspiracy, bank fraud, and false entries convictions, and 36 months' imprisonment on the false tax returns conviction, all to be served concurrently.

In January 2006, the district court sentenced Childers and Bishop. With an offense level of 26 and a criminal history category of I, Bishop's advisory guidelines range was 63-78 months' imprisonment. After consideration of the 18 U.S.C. § 3553(a) factors, the district court imposed a downward variance, and sentenced Bishop to 48 months' imprisonment.

With an offense level of 16 and a criminal history category of I, Childers's advisory guidelines range was 21-27 months' imprisonment. The district court sentenced Childers to 21 months' imprisonment, the low end of his advisory guidelines range.[8]

Also in January 2006, the district court held a separate hearing on restitution. The district court ordered Patterson and Bishop, jointly and severally, to pay

---

[8]Neither the government nor defendants appeal the duration of defendants' sentences.

$1,776,974.24 in restitution.

## II. DISCUSSION

All defendants contend that the government presented insufficient evidence to sustain their convictions.[9] Defendants further contend that the district court improperly admitted evidence of: (1) Patterson's attempts to help fund the Hamakers' defense; (2) Patterson's attempts to have Alred, Bean, and Caughren fired; (3) MCC's Quickbooks records, a printout of an MCC Quickbook record with former MCC employee Tina Rogers's handwriting in the margins, and MCC's employee timesheets; (4) summary charts of J&M's billings prepared by an FBI special agent; and (5) only a selected portion, as opposed to the entirety, of certain "statements" given by Childers.[10] Patterson further argues that the superseding indictment was obtained improperly,[11] and that his convictions should be reversed because the district court was biased against him.[12] Childers further contends that

---

[9]We review a challenge to the sufficiency of the evidence de novo, and view all evidence in the light most favorable to the government. United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

[10]A district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996).

[11]Generally, the denial of a motion to dismiss the indictment is reviewed for abuse of discretion; however, to the extent that the motion to dismiss implicates questions of law, the review is de novo. United States v. Noriega, 117 F.3d 1206, 1211 (11th Cir. 1997).

[12]A district judge's conduct during trial is reviewed for abuse of discretion. United States v. Verbitskaya, 406 F.3d 1324, 1337 (11th Cir. 2005).

24

the district court should have severed his trial from Patterson's and Bishop's.[13]

Finally, Patterson and Bishop argue that the district court erroneously ordered them to pay over $1.7 million in restitution.[14]

After careful review and oral argument, we conclude that each of these arguments lack merit. Only defendants' sufficiency-of-the-evidence arguments warrant further discussion.

## A.    Conspiracy

All defendants contend that the government presented insufficient evidence that they agreed to defraud Community Bank, misapply bank funds, and/or make false entries in bank books. We disagree.

To sustain a conspiracy conviction under 18 U.S.C. § 371, the government must prove: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendants' knowing and voluntary participation in the agreement; and (3) the commission of an act in furtherance of the agreement." United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998) (emphasis omitted). The key element of conspiracy is the agreement to commit an unlawful act. See United

---

[13]The denial of a motion to sever is reviewed for abuse of discretion. United States v. Garcia-Jaimes, 484 F.3d 1311, 1320 (11th Cir. 2007).

[14]The legality of a restitution order is reviewed de novo, but the factual findings underlying the restitution order are reviewed for clear error. United States v. Washington, 434 F.3d 1265, 1267 (11th Cir. 2006).

States v. Chandler, 388 F.3d 796, 805 (11th Cir. 2004). However, "[b]ecause the essential nature of conspiracy is secrecy, such an agreement may be proved by circumstantial as well as direct evidence." United States v. Browning, 723 F.2d 1544, 1546 (11th Cir. 1984); see also United States v. Tampas, 493 F.3d 1291, 1298 (11th Cir. 2007) (conspiracy can be proven by circumstantial evidence).

After having outlined the trial evidence in great detail above, we conclude that substantial evidence supports defendants' conspiracy convictions. The government established that Patterson and Bishop engaged in a fraud scheme whereby they had contractors (including Childers's J&M) perform substantial construction work at Patterson's personal properties and invoice that work to Community Bank as purportedly done for the Bank. Patterson and Bishop then had Bishop approve the invoices for payment by Community Bank, and in turn, Community Bank actually paid the invoices.

Specifically, the government presented ample evidence from which the jury reasonably could have concluded that: (1) Patterson was building a multi-million dollar mansion for himself at HVF and having other construction work performed at his personal properties; (2) Patterson, as CEO and Chairman of the Board of Community Bank, knew that Community Bank was simultaneously engaged in various corporate construction projects throughout Alabama; (3) Bishop personally

managed both Patterson's personal construction projects and construction on the Community Bank projects; (4) the same contractors, including Childers's J&M and the Hamakers' MCC, were retained to work on both Patterson's personal construction projects and on the Community Bank projects; (5) between January 1998 and July 2000, those contractors performed hundreds of thousands of dollars of work at Patterson's personal properties, including HVF, and Patterson knew such substantial work was performed; (6) between January 1998 and July 2000, Patterson received essentially no bills from the contractors, and paid essentially no money to those contractors, for the substantial work on Patterson's personal properties; (7) between January 1998 and July 2000, there was very little work actually performed by the contractors at Community Bank sites; and (8) Bishop approved Community Bank's payment of hundreds of thousands of dollars for work reportedly performed at Community Bank sites, when Patterson and Bishop knew the work performed and billed by the contractors was actually performed at HVF and Patterson's other personal properties.[15]

There was also evidence that although Patterson had Bishop manage Patterson's personal construction projects, Patterson paid Bishop very little money

---

[15]To give one example, although hardly anything had been built above-ground at Community Bank's Guntersville site, various contractors charged, Bishop approved, and Community Bank paid, over $700,000 of work as purportedly performed at Guntersville when in fact that work had been performed at Patterson's HVF and other personal properties.

during the course of HVF's construction and promised Bishop that he would be "well compensated" upon HVF's completion. The government further established that after defendants' scheme was discovered and the Hamakers were indicted for MCC's fraudulent billing of Community Bank for work on Patterson's personal projects, Patterson went to great lengths to orchestrate payment of the Hamakers' legal bills so that they could have the benefit of private counsel. Additionally, the government showed that until the Townes litigation commenced in late 1998, Patterson was never invoiced by MCC for work on his HVF project, and Bishop never requested separate invoices for HVF and Community Bank projects. Even after commencement of the Townes litigation—and despite MCC's substantial work on HVF—MCC invoiced Patterson only twice, and Patterson was not invoiced at all by MCC between April 1999 and July 2000. However, between July 2000—the time defendants' scheme was discovered—and December 2000, MCC sent Patterson twenty-nine invoices, seeking to recover for construction services at HVF as long ago as 1998. There was also evidence that CAC actually tried to separately invoice HVF and Community Bank projects from the beginning, but Bishop expressly resisted those efforts.

As for Childers, the evidence showed that, through J&M, he fraudulently billed Community Bank for approximately $325,000, representing that it was for

28

work performed on Community Bank sites. In actuality, most of the $325,000 that Childers invoiced was for work performed by J&M or its subcontractors at Patterson's HVF, and not Community Bank sites. As part of the scheme, Bishop in turn approved, and Community Bank paid, these invoices from Childers. The evidence also established that in June 2000, as the defendants' scheme was being discovered, Childers directed a new employee—Speegle—to falsify charts that purported to reflect work performed by J&M and its subcontractors at Community Bank sites. Speegle testified that Childers gave him a list of invoices and instructed him to fabricate hours worked at Community Bank sites, so as to match the amounts billed to the hours reflected as worked on the charts. From this evidence, the jury reasonably could have concluded that Childers knowingly participated in the conspiracy with Bishop and Patterson.

Thus, contrary to defendants' contentions, the government presented ample evidence that defendants agreed amongst themselves, and also with the Hamakers, to defraud Community Bank. While mere presence or close association with co-conspirators is insufficient to establish knowing participation in a conspiracy, see United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994), the government's substantial evidence here establishes far more than association. Moreover, while defendants emphasize that there was evidence that "Patterson told

29

Bishop to keep the billings separate," in actuality, the evidence only established that Bishop told investigators, after-the-fact, that Patterson told him to keep the HVF and Community Bank billings separate. Such after-the-fact statements by Bishop are not altogether unsurprising, and regardless, the jury was free to disregard this evidence. See United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) (recognizing that "'[a] jury is free to choose among the constructions of the evidence'") (citation omitted).[16] Accordingly, we conclude that there was sufficient evidence to sustain defendants' conspiracy convictions.

## B.    Bank fraud

Counts 2-4 charged defendants with defrauding Community Bank by causing the Bank to pay J&M invoices that purported to charge for work performed at Community Bank sites but actually charged for work performed at HVF. In order to sustain a conviction for bank fraud, the government must show that a defendant knowingly executed or attempted to execute a scheme (1) to

---

[16]Likewise, we reject Childers's claim that the district court erred because it "failed to [require the jury to] exclude every reasonable hypothesis except guilt." Although this Court once subscribed to that standard, we rejected it long ago. See United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."); see also Calderon, 127 F.3d at 1324 (same); Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982) (adopting all post-September 30, 1981 decisions of Unit B of the former Fifth Circuit as binding precedent in the Eleventh Circuit).

defraud a financial institution, or (2) to obtain by false or fraudulent pretenses, representations, or promises any of the monies or other properties of a financial institution.  See United States v. McCarrick, 294 F.3d 1286, 1290 (11th Cir. 2002) (quoting 18 U.S.C. § 1344).  "[C]ircumstantial evidence may prove knowledge and intent," United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004), and knowledge and intent may also be proven through defendants' false exculpatory statements, see United States v. McDowell, 250 F.3d 1354, 1367 (11th Cir. 2001).

Defendants acknowledge that the government's evidence as to the bank fraud counts is essentially the same as for the conspiracy count, and defendants do not raise any new arguments as to bank fraud.  Defendants argue only that the jury drew unreasonable and unsupported inferences from the circumstantial evidence in convicting defendants of the bank fraud counts.  As discussed above, we disagree.  Accordingly, we conclude that there was ample evidence to sustain defendants' bank fraud convictions.

## C.    False entries

Defendants proffer two arguments as to why the government presented insufficient evidence to sustain their false entries convictions.  We reject both.

First, defendants contend that the government failed to present any evidence that they knowingly caused false entries in Community Bank's books and records.

31

We disagree. 18 U.S.C. § 1005 prohibits knowingly and willfully making, or causing to be made, a false entry in a book or record of a federally insured bank, with the intent to defraud or deceive. "The prohibition of false entries is in broad and comprehensive terms," and "[t]he purpose of the statute is to help insure that inspection of a bank's books will yield a true picture of the bank's condition." United States v. De La Mata, 266 F.3d 1275, 1296 (11th Cir. 2001). As discussed, the government presented substantial evidence that defendants knowingly caused false invoices from J&M and MCC to be paid by Community Bank, which defendants knew would cause false entries to be made on Community Bank's general ledgers. Accordingly, we reject defendants' first challenge to their false entries convictions.

Defendants' second attack on their false entries convictions is premised on United States v. Manderson, 511 F.2d 179 (5th Cir. 1975),[17] in which our predecessor Court stated that "[i]t cannot be a false entry to make an entry on the books of the bank which correctly reflects the transaction and was so intended." Manderson, 511 F.2d at 181. According to defendants, the entries made on Community Bank's general ledger as a result of the MCC and J&M invoices

_____

[17]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

accurately reflect the Bank's payment of those invoices, so the entries "correctly reflect[] the transaction[s]" that occurred and cannot amount to illegal false entries under Manderson.

We find Manderson materially distinguishable. As the Manderson Court itself recognized, in that case, "[t]here was no attempt to defraud" the bank, and the bank was not defrauded. Id. at 180. Instead, in Manderson, the defendant bank employee knew that funds had been (properly) issued by the bank, and he attempted to extort some of those funds after-the-fact. As the Manderson Court noted, the entry made in the bank's books for the check in that case "was the very entry that should have been made had there been no later effort to extort." Id. at 181. By contrast, in this case, entries were made that reflected Community Bank payments for services that were not actually performed for Community Bank. Moreover, as discussed supra, there certainly was an "attempt to defraud" Community Bank. Id. at 180. Accordingly, we conclude that there was sufficient evidence presented to sustain defendants' false entries convictions.

**D.     False statements on tax returns**

Finally, Patterson challenges his convictions under 26 U.S.C. § 7206(1) for making false statements on his 1998 and 1999 income tax returns by omitting income received in the form of work performed by MCC at HVF. Under § 7206,

33

the government was required to prove that Patterson willfully filed a tax return that he did not believe to be true and correct as to every material matter therein. See United States v. Kaiser, 893 F.2d 1300, 1305 (11th Cir. 1990).

Patterson acknowledges that the government used the same evidence to prove the tax return counts (Counts 22-23) as it did to prove the bank fraud and false entries counts, and accordingly, the only argument that Patterson makes as to the sufficiency of the evidence on the tax return counts is that the government's evidence as to the bank fraud and false entries counts was insufficient. Because we have already rejected Patterson's sufficiency arguments as to the bank fraud and false entries counts, we also reject those arguments here.

## III.  CONCLUSION

For the above reasons, we affirm defendants' convictions and sentences.

**AFFIRMED.**